## LINCOLN FEDERAL LABOR UNION ET AL. *v.* NORTHWESTERN IRON & METAL CO. ET AL.

NO. 47.

Argued November 8–10, 1948.—Decided January 3, 1949.

*Herbert S. Thatcher* argued the cause for appellants in both cases and *George Pennell* argued the cause for appellants in No. 34. With them on the brief for appellants were *J. Albert Woll, James A. Glenn, J. H. Morgan* and *H. S. McCluskey.*

*Irving Hill* argued the cause and filed a brief for the Northwestern Iron & Metal Co., appellee in No. 47.

*Edson Smith* argued the cause for the Nebraska Small Business Men's Association, and *Robert A. Nelson,* Assistant Attorney General of Nebraska, for the State of Nebraska, appellees in No. 47. With them on the brief were *Walter R. Johnson,* Attorney General of Nebraska, *Clarence S. Beck,* Deputy Attorney General, and *Edward R. Burke.*

*Ralph Moody,* Assistant Attorney General of North Carolina, argued the cause for appellee in No. 34. With him on the brief was *Harry McMullan,* Attorney General.

*Arthur J. Goldberg* and *Frank Donner* filed an *amicus curiae* memorandum on behalf of the Congress of Indus-

trial Organizations and its affiliated organizations, in support of appellants.

An *amicus curiae* brief in support of appellees was filed on behalf of the States of Florida, by *J. Tom Watson,* Attorney General; Michigan, by *Eugene F. Black,* Attorney General; North Dakota, by *P. O. Sathre,* Attorney General; Tennessee, by *William F. Barry,* Solicitor General; Utah, by *Grover A. Giles,* Attorney General; and Wisconsin, by *Grover L. Broadfoot,* Attorney General, *Stewart G. Honeck,* Deputy Attorney General, and *Beatrice Lampert,* Assistant Attorney General.

MR. JUSTICE BLACK delivered the opinion of the Court.

Under employment practices in the United States, employers have sometimes limited work opportunities to members of unions, sometimes to non-union members, and at other times have employed and kept their workers without regard to whether they were or were not members of a union. Employers are commanded to follow this latter employment practice in the states of North Carolina and Nebraska. A North Carolina statute and a Nebraska constitutional amendment[1] provide that no

---

[1] Section 2 of Chapter 328 of the North Carolina Session Laws, enacted in 1947, reads as follows:

"Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against the public policy and an illegal combination or conspiracy in restraint of trade or commerce in the State of North Carolina."

Nebraska in 1946 adopted a constitutional amendment, Art. XV, § 13 of which reads as follows:

"No person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organ-

person in those states shall be denied an opportunity to obtain or retain employment because he is or is not a member of a labor organization. To enforce this policy North Carolina and Nebraska employers are also forbidden to enter into contracts or agreements obligating themselves to exclude persons from employment because they are or are not labor union members.[2]

These state laws were given timely challenge in North Carolina and Nebraska courts on the ground that insofar as they attempt to protect non-union members from discrimination, the laws are in violation of rights guaranteed employers, unions, and their members by the United States Constitution.[3] The state laws were challenged as violations of the right of freedom of speech, of assembly

---

ization or because of refusal to join or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or nonmembership in a labor organization."

[2] Shops that refuse to employ any but union members are sometimes designated as "closed shops," sometimes as "union shops." Contracts which obligate an employer to employ none but union members are sometimes designated as union security agreements, closed shop contracts or union shop contracts. There is also much dispute as to the exact meaning of the term "open shop." See *Encyclopedia of Social Sciences*, Vol. 3 (1930), pp. 568–569. There is such an important difference in emphasis between these different labels that we think it better to avoid use of any of them in this opinion.

[3] The Nebraska constitutional amendment was challenged in an action for equitable relief and for a declaratory judgment. A substantial basis of the complaint was that employers had refused to comply with the request of unions to discharge certain employees who had failed to retain union membership. In North Carolina, criminal proceedings were instituted against the appellants charging that an agreement made unlawful by the statute had been entered into by the appellant employer and the other appellants, who are officers and agents of labor unions affiliated with the American Federation of Labor.

and of petition guaranteed unions and their members by "the First Amendment and protected against invasion by the State under the Fourteenth Amendment." It was further contended that the state laws impaired the obligations of existing contracts in violation of Art. I, § 10, of the United States Constitution and deprived the appellant unions and employers of equal protection and due process of law guaranteed against state invasion by the Fourteenth Amendment. All of these contentions were rejected by the State Supreme Courts [4] and the cases are here on appeal under § 237 of the Judicial Code, 28 U. S. C. § 344 (now 28 U. S. C. § 1257). The substantial identity of the questions raised in the two cases prompted us to set them for argument together and for the same reason we now consider the cases in a single opinion.

*First.* It is contended that these state laws abridge the freedom of speech and the opportunities of unions and their members "peaceably to assemble, and to petition the Government for a redress of grievances." [5] Under the state policy adopted by these laws, employers must, other considerations being equal, give equal opportunities for

---

[4] *State* v. *Whitaker,* 228 N. C. 352, 45 S. E. 2d 860; *Lincoln Federal Labor Union No. 19129* v. *Northwestern Iron & Metal Co.,* 149 Neb. 507, 31 N. W. 2d 477. See also *American Federation of Labor* v. *American Sash & Door Co.,* 67 Ariz. 20, 189 P. 2d 912. An appeal in this latter case was also argued along with the two cases considered in this opinion. We have treated the Arizona case in a separate opinion, *post,* p. 538, because the challenged Arizona amendment presents a question not raised in the Nebraska or North Carolina laws.

[5] This contention rests on the premise that the Fourteenth Amendment makes the prohibitions and guarantees of the First Amendment applicable to state action. See *West Virginia* v. *Barnette,* 319 U. S. 624, 639. The pertinent language of the First Amendment is "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

remunerative work to union and non-union members without discrimination against either. In order to achieve this objective of equal opportunity for the two groups, employers are forbidden to make contracts which would obligate them to hire or keep none but union members. Nothing in the language of the laws indicates a purpose to prohibit speech, assembly, or petition. Precisely what these state laws do is to forbid employers acting alone or in concert with labor organizations deliberately to restrict employment to none but union members.

It is difficult to see how enforcement of this state policy could infringe the freedom of speech of anyone, or deny to anyone the right to assemble or to petition for a redress of grievances. And appellants do not contend that the laws expressly forbid the full exercise of those rights by unions or union members. Their contention is that these state laws indirectly infringe their constitutional rights of speech, assembly, and petition. While the basis of this contention is not entirely clear, it seems to rest on this line of reasoning: The right of unions and union members to demand that no non-union members work along with union members is "indispensable to the right of self-organization and the association of workers into unions"; without a right of union members to refuse to work with non-union members, there are "no means of eliminating the competition of the non-union worker"; since, the reasoning continues, a "closed shop" is indispensable to achievement of sufficient union membership to put unions and employers on a full equality for collective bargaining, a closed shop is consequently "an indispensable concomitant" of "the right of employees to assemble into and associate together through labor organizations . . . ." Justification for such an expansive construction of the right to speak, assemble and petition is

then rested in part on appellants' assertion "that the right to work as a non-unionist is in no way equivalent to or the parallel of the right to work as a union member; that there exists no constitutional right to work as a non-unionist on the one hand while the right to maintain employment free from discrimination because of union membership is constitutionally protected." *Cf. Wallace Corporation* v. *Labor Board,* 323 U. S. 248.

We deem it unnecessary to elaborate the numerous reasons for our rejection of this contention of appellants. Nor need we appraise or analyze with particularity the rather startling ideas suggested to support some of the premises on which appellants' conclusions rest. There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employment all other persons who will not or can not participate in union assemblies. The constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly's plans. For where conduct affects the interests of other individuals and the general public, the legality of that conduct must be measured by whether the conduct conforms to valid law, even though the conduct is engaged in pursuant to plans of an assembly.

*Second.* There is a suggestion though not elaborated in briefs that these state laws conflict with Art. I, § 10, of the United States Constitution, insofar as they impair the obligation of contracts made prior to their enactment. That this contention is without merit is now too clearly established to require discussion. See *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 436–439, and cases

there cited. And also *Veix* v. *Sixth Ward Bldg. & Loan Assn.,* 310 U. S. 32, 38; *East New York Savings Bank* v. *Hahn,* 326 U. S. 230, 232.

*Third.* It is contended that the North Carolina and Nebraska laws deny unions and their members equal protection of the laws and thus offend the equal protection clause of the Fourteenth Amendment. Because the outlawed contracts are a useful incentive to the growth of union membership, it is said that these laws weaken the bargaining power of unions and correspondingly strengthen the power of employers. This may be true. But there are other matters to be considered. The state laws also make it impossible for an employer to make contracts with company unions which obligate the employer to refuse jobs to union members. In this respect, these state laws protect the employment opportunities of members of independent unions. See *Wallace Corporation* v. *Labor Board, supra.* This circumstance alone, without regard to others that need not be mentioned, is sufficient to support the state laws against a charge that they deny equal protection to unions as against employers and non-union workers.

It is also argued that the state laws do not provide protection for union members equal to that provided for non-union members. But in identical language these state laws forbid employers to discriminate against union and non-union members. Nebraska and North Carolina thus command equal employment opportunities for both groups of workers. It is precisely because these state laws command equal opportunities for both groups that appellants argue that the constitutionally protected rights of assembly and due process have been violated. For the constitutional protections surrounding these rights are relied on by appellants to support a contention that the Federal Constitution guarantees greater employment

rights to union members than to non-union members. This claim of appellants is itself a refutation of the contention that the Nebraska and North Carolina laws fail to afford protection to union members equal to the protection afforded non-union workers.

*Fourth.* It is contended that these state laws deprive appellants of their liberty without due process of law in violation of the Fourteenth Amendment. Appellants argue that the laws are specifically designed to deprive all persons within the two states of "liberty" (1) to refuse to hire or retain any person in employment because he is or is not a union member, and (2) to make a contract or agreement to engage in such employment discrimination against union or non-union members.

Much of appellants' argument here seeks to establish that due process of law is denied employees and union men by that part of these state laws that forbids them to make contracts with the employer obligating him to refuse to hire or retain non-union workers. But that part of these laws does no more than provide a method to aid enforcement of the heart of the laws, namely, their command that employers must not discriminate against either union or non-union members because they are such. If the states have constitutional power to ban such discrimination by law, they also have power to ban contracts which if performed would bring about the prohibited discrimination. *Chicago, B. & Q. R. Co.* v. *McGuire,* 219 U. S. 549, 570, 571.

Many cases are cited by appellants in which this Court has said that in some instances the due process clause protects the liberty of persons to make contracts. But none of these cases, even those according the broadest constitutional protection to the making of contracts, ever went so far as to indicate that the due process clause bars a state from prohibiting contracts to engage in con-

duct banned by a valid state law. So here, if the provisions in the state laws against employer discrimination are valid, it follows that the contract prohibition also is valid. *Bayside Fish Flour Co.* v. *Gentry,* 297 U. S. 422, 427. And see *Sage* v. *Hampe,* 235 U. S. 99, 104–105. We therefore turn to the decisive question under the due process contention, which is: Does the due process clause forbid a state to pass laws clearly designed to safeguard the opportunity of non-union workers to get and hold jobs, free from discrimination against them because they are non-union workers?

There was a period in which labor union members who wanted to get and hold jobs were the victims of widespread employer discrimination practices. Contracts between employers and their employees were used by employers to accomplish this anti-union employment discrimination. Before hiring workers, employers required them to sign agreements stating that the workers were not and would not become labor union members. Such anti-union practices were so obnoxious to workers that they gave these required agreements the name of "yellow dog contracts." This hostility of workers also prompted passage of state and federal laws to ban employer discrimination against union members and to outlaw yellow dog contracts.

In 1907 this Court in *Adair* v. *United States,* 208 U. S. 161, considered the federal law which prohibited discrimination against union workers. Adair, an agent of the Louisville & Nashville Railroad Company, had been indicted and convicted for having discharged Coppage, an employee of the railroad, because Coppage was a member of the Order of Locomotive Firemen. This Court there held, over the dissents of Justices McKenna and Holmes, that the railroad, because of the due process clause of the Fifth Amendment, had a constitutional right to dis-

criminate against union members and could therefore do so through use of yellow dog contracts. The chief reliance for this holding was *Lochner* v. *New York,* 198 U. S. 45, which had invalidated a New York law prescribing maximum hours for work in bakeries. This Court had found support for its *Lochner* holding in what had been said in *Allgeyer* v. *Louisiana,* 165 U. S. 578, a case on which appellants here strongly rely. There were strong dissents in the *Adair* and *Lochner* cases.

In 1914 this Court reaffirmed the principles of the *Adair* case in *Coppage* v. *Kansas,* 236 U. S. 1, again over strong dissents, and held that a Kansas statute outlawing yellow dog contracts denied employers and employees a liberty to fix terms of employment. For this reason the law was held invalid under the due process clause.

The *Allgeyer-Lochner-Adair-Coppage* constitutional doctrine was for some years followed by this Court. It was used to strike down laws fixing minimum wages and maximum hours in employment, laws fixing prices, and laws regulating business activities. See cases cited in *Olsen* v. *Nebraska,* 313 U. S. 236, 244–246, and *Osborn* v. *Ozlin,* 310 U. S. 53, 66–67. And the same constitutional philosophy was faithfully adhered to in *Adams* v. *Tanner,* 244 U. S. 590, a case strongly pressed upon us by appellants. In *Adams* v. *Tanner,* this Court with four justices dissenting struck down a state law absolutely prohibiting maintenance of private employment agencies. The majority found that such businesses were highly beneficial to the public and upon this conclusion held that the state was without power to proscribe them. Our holding and opinion in *Olsen* v. *Nebraska, supra,* clearly undermined *Adams* v. *Tanner.*

Appellants also rely heavily on certain language used in this Court's opinion in *Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522. In that case the

Court invalidated a state law which in part provided a
method for a state agency to fix wages and hours.[6]  See
*Wolff Co.* v. *Industrial Court,* 267 U. S. 552, 565.  In in-
validating this part of the state act, this Court construed
the due process clause as forbidding legislation to fix hours
and wages, or to fix prices of products.  The Court also
relied on a distinction between businesses according to
whether they were or were not "clothed with a public
interest."  This latter distinction was rejected in *Nebbia*
v. *New York,* 291 U. S. 502.  That the due process clause
does not ban legislative power to fix prices, wages and
hours as was assumed in the *Wolff* case, was settled as
to price fixing in the *Nebbia* and *Olsen* cases.  That
wages and hours can be fixed by law is no longer doubted
since *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379;
*United States* v. *Darby,* 312 U. S. 100, 125; *Phelps Dodge
Corp.* v. *Labor Board,* 313 U. S. 177, 187.

This Court beginning at least as early as 1934, when
the *Nebbia* case was decided, has steadily rejected the due
process philosophy enunciated in the *Adair-Coppage* line
of cases.  In doing so it has consciously returned closer
and closer to the earlier constitutional principle that states
have power to legislate against what are found to be
injurious practices in their internal commercial and busi-
ness affairs, so long as their laws do not run afoul of some
specific federal constitutional prohibition, or of some valid
federal law.  See *Nebbia* v. *New York, supra* at 523–
524, and *West Coast Hotel Co.* v. *Parrish, supra* at 392–
395, and cases cited.  Under this constitutional doctrine
the due process clause is no longer to be so broadly con-
strued that the Congress and state legislatures are put in

---

[6] Other parts of the state statute related to matters other than
wages, prices, and the making of contracts of employment.  Con-
siderations involved in the constitutional validity of those other
parts of the statute are not relevant here.

a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare.

Appellants now ask us to return, at least in part, to the due process philosophy that has been deliberately discarded. Claiming that the Federal Constitution itself affords protection for union members against discrimination, they nevertheless assert that the same Constitution forbids a state from providing the same protection for non-union members. Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that legislative protection can be afforded non-union workers.

*Affirmed.*

[For concurring opinion of MR. JUSTICE FRANKFURTER, see *post,* p. 542.]

[For concurring opinion of MR. JUSTICE RUTLEDGE, joined by MR. JUSTICE MURPHY insofar as it applies to Nos. 34 and 47, see *post,* p. 557.]